**WO**                                                                                               JL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| Oscar Contreras Aguilar, | No.   CV-23-00582-TUC-SHR |
|---|---|
| Plaintiff, | |
| v. | **ORDER** |
| M. Gutierrez, et al., | |
| Defendants. | |

**I.   Procedural History**

On December 26, 2023, Oscar Contreras Aguilar,[1] who is currently confined in the United States Penitentiary (USP)-Allenwood in White Deer, Pennsylvania, and another prisoner, Dominic Xavier McDonald, filed a handwritten civil rights Complaint, a handwritten Motion to Proceed In Forma Pauperis, and an Emergency Motion for Preliminary Injunction in 23-CV-00574-TUC-SHR.  Subsequently, they filed an Emergency Motion for an Order Directing Defendant to Preserve Certain Surveillance Footage/Videos and an Emergency Motion for a Temporary Restraining Order.  In a January 23, 2024 Order in 23-CV-00574, the Court severed the case into separate actions for each Plaintiff, dismissed the Complaint, and denied the pending Motions.  The Court gave each Plaintiff 30 days, in his or her individual case, to either (1) submit a properly executed and certified Application to Proceed In Forma Pauperis using the form included with the Order, or (2) pay the $405.00 filing and administrative fees; and to file an amended

---

[1] Plaintiff refers to herself with feminine pronouns.  The Court will do the same.

complaint providing specific facts regarding how he or she was personally injured by the alleged constitutional violations and omitting facts regarding the former co-plaintiff. This case was opened on behalf of Plaintiff Aguilar (hereinafter, "Plaintiff").

On February 5, 2024, Plaintiff filed her First Amended Complaint. Plaintiff subsequently filed an Emergency Motion for Preliminary Injunction and Temporary Restraining Order, a Request for Appropriate Action, and a Request for Prompt Action. Plaintiff had not paid the filing and administrative fees for this case or filed an Application to Proceed In Forma Pauperis as required by the January 23, 2024 Order in 23-CV-00574. In a May 17, 2024 Order in this case, the Court gave Plaintiff 30 days to either (1) submit a properly executed and certified Application to Proceed In Forma Pauperis using the form included with the Order or (2) pay the $405.00 filing and administrative fees.

After requesting and receiving an extension of time, on July 19, 2024, Plaintiff filed an Application to Proceed In Forma Pauperis. In an August 5, 2024 Order, the Court granted the Application to Proceed, denied as moot Plaintiff's Request for Appropriate Action, Request for Prompt Action, and Emergency Motion, and dismissed the First Amended Complaint with leave to amend because Plaintiff had failed to state a claim. The Court gave Plaintiff 30 days to file a second amended complaint curing the deficiencies identified in the Order.

On August 16, 2024, Plaintiff filed a Second Amended Complaint (Doc. 16). Plaintiff has also filed an Emergency Motion for Preliminary Injunction (Doc. 17) and a Motion to Appoint Counsel (Doc. 19). The Court will deny the Motion to Appoint Counsel without prejudice and require Defendants to answer the Second Amended Complaint and the Emergency Motion for Preliminary Injunction.

**II.    Statutory Screening of Prisoner Complaints**

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if a plaintiff has raised legally frivolous or malicious claims, fails to state a claim upon which relief may

be granted, or seeks monetary relief from a defendant who is immune from such relief. § 1915A(b)(1)–(2).

A pleading must contain a "short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct. *Id.* at 681.

But as the United States Court of Appeals for the Ninth Circuit has instructed, courts must "continue to construe *pro se* filings liberally." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). A "complaint [filed by a *pro se* prisoner] 'must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

**III.   Discussion of Second Amended Complaint**

In her three-count Second Amended Complaint, Plaintiff sues the United States, Federal Bureau of Prisons (BOP) Director Colette Peters, and USP-Allenwood Warden D. Christensen. Plaintiff asserts claims regarding events that occurred while she was in custody at USP-Tucson. She seeks injunctive relief under 28 U.S.C. § 1331 and monetary relief under the Federal Tort Claims Act (FTCA).

Plaintiff alleges the following:

On October 31, 2023, while Plaintiff was housed in the Special Housing Unit (SHU) at USP-Tucson, numerous officers under the supervision of Lieutenants Mendoza and Castro conducted a "cell extraction" of Plaintiff's cellmate.  Before they entered the cell, the officers shut off the air vent and the water.  For 30 minutes, the officers attacked Plaintiff and her cellmate by throwing dozens of concussion/tear gas grenades into the cell and shooting at Plaintiff and her cellmate with rubber bullets.  The officers then opened the cell door and assaulted Plaintiff by slamming her on the ground and repeatedly punching and kicking her in the head, face, neck, upper torso, and back, although Plaintiff "was not resisting at all and did not have anything to do with her cellmate's psychological disturbance."  While Plaintiff was on the floor on her stomach, semi-conscious with a severe nosebleed, one of the officers handcuffed Plaintiff and tried to break her right index finger by violently bending it out of place, which sprained or dislocated Plaintiff's finger.  Before the officers pulled Plaintiff out of the cell, they threatened to inflict more serious bodily harm on her if she did not "state that she had tripped and fallen" during the brief medical assessment that was to follow.

Plaintiff was "nearly dragged" to a holding cell in the SHU, where multiple officers ripped and cut off Plaintiff's clothing.  While Plaintiff was facing a wall, one of the officers violently yanked the handcuffs, which were behind her back, so hard that Plaintiff immediately felt a burning sensation and numbness from her left hand all the way up her left arm.  Despite her visible injuries, Plaintiff did not receive any medical care, treatment, or pain medication.

Numerous officers then placed Plaintiff in ambulatory restraints including steel cuffs with a "black box," a belly chain, and leg irons.  Plaintiff was left in the "excessively tight" restraints for approximately 20 hours.  Although multiple nurses checked on Plaintiff's restraints, they only ensured there was some circulation so Plaintiff's "arms/hands [would not] 'fall off'"; the nurses did not "care about the restraints being so tight that they caused numbness, swelling, and extreme discomfort/distress."  The nurses

made medical notes and reports stating Plaintiff "appear[ed] well" and was not experiencing any distress but did not report Plaintiff's visible injuries. According to Plaintiff, it is a "common practice" of USP-Tucson SHU nurses to not report injuries or to diminish their severity in medical documents.

On November 3, 2023, Plaintiff reported she was having a psychological breakdown and was considering suicide to SHU Officers M. Ruiz and A. Alvarez. The officers "repeatedly disregarded" Plaintiff and encouraged her to "kill" or "hang" herself. About an hour later, Plaintiff attempted to commit suicide by hanging. Officers Alvarez and R. Fragoso sprayed Plaintiff with large amounts of "chemical agents" and called her a "clown ass bitch." The officers took Plaintiff to a holding cell in the SHU where there are no cameras, and, after conducting a brief medical assessment with a handheld camera, the officers physically and sexually assaulted Plaintiff. While Officers Ruiz and Alvarez had Plaintiff facing the back wall of the holding cell, Officer Ruiz groped Plaintiff's buttocks and slid his hand up and down Plaintiff's back while whispering in Plaintiff's ear, "Why are you feeling suicidal? Is it because you ain't hav[ing] anal intercourse today? You want some dick? Is that what it is? I'll give you some dick if that'll stop you from being suicidal," or "words to that effect." At the same time, Officer Alvarez "caressed and rubbed" Plaintiff's right earlobe and neck. At that point, Lieutenant Garcia yelled, "Put him on the ground!" Officers Ruiz and Alvarez began yelling, "Stop resisting! Stop resisting!" and violently slammed Plaintiff onto the ground even though she had not been resisting. The officers began kicking and punching Plaintiff in the back, ribs, and stomach. The officers then placed Plaintiff in steel ambulatory restraints and summoned Nurse Quezada for a brief medical assessment. A few "drops/squirts" of water were dropped on Plaintiff's face, but she was not given a chance to shower or decontaminate from the chemical agents on her body. Plaintiff was left in the ambulatory restraints for approximately 20 hours.

In the days and weeks following these incidents, Plaintiff repeatedly requested medical care for her injuries verbally and through written requests to medical staff, but

virtually all her requests were ignored, not processed, denied, or unduly delayed for months. On November 22, 2023, Plaintiff verbally reminded Nurse Quezada about the injuries she had suffered on October 31, 2023. Nurse Quezada responded by "exhibiting angry behavior and stating he did not care about Plaintiff's injuries and to tell someone else and or words to that effect." Plaintiff also reminded Nurse Quezada about her "fractured/crooked" nose and continued severe neck, head, and spinal/back pain, but Nurse Quezada responded, "Fuck your nose. And stop sending sick calls because I will trash them. Suck it up like a man," or "words to that effect."

On November 24, 2023, Plaintiff stopped Nurse Williams while he was distributing medication and reminded Williams of her injuries and the ignored sick calls. Nurse Williams responded, "Hey man, I ain't the one denying y[']all medical care. They fucked up big time by assaulting y[']all on camera. So they gonna delay giving y[']all medical care until y[']all heal," or "words to that effect." Plaintiff asked Nurse Williams to at least give her pain relief medication. Nurse Williams stated he could not give Plaintiff anything and it was "up to them" or "words to that effect."

Plaintiff also reported her injuries to Warden Gutierrez during one of his SHU rounds and asked him for help getting medical care, but Gutierrez disregarded Plaintiff's concerns and requests.

On December 8, 2023, Plaintiff underwent X-rays of her nose and left hand, but not of her neck and back, despite her complaints of severe pain in those areas. The nurse who took the X-rays told Plaintiff her nose might have been badly fractured, but it appeared to have healed. The results of the X-rays are unknown to Plaintiff.

While she was in the SHU, Plaintiff repeatedly requested BP-8 and BP-9 forms from SHU officers and Unit Team staff, including Unit Manager Mark Palmer, CSW Michael Mack, and Counselor Wright, but her repeated requests for grievance forms were ignored or denied. According to Plaintiff, Palmer, Mack, and Wright "employed spinning tactics, deceit, and misrepresentations to mislead Plaintiff about the process to get a grievance form, and to not provide [the] forms."

In December 2023, Plaintiff submitted two SF-95 claims to BOP's Western Regional Office regarding the October 31 and November 3, 2023 incidents. The Western Regional Office sent Plaintiff acknowledgements of receipt of both claims. Six months elapsed without a conclusive denial of Plaintiff's claims.

As her injury, Plaintiff alleges she suffered a "fractured/crooked nose," severe bleeding, bruises/contusions all over her face, head, neck, upper torso, and back, severe burns, numbness, swelling, extreme discomfort, intense pain, permanent nerve damage, severe emotional and psychological distress, permanent "scars/marks," a sprained neck, and persistent spinal/back pain.

Plaintiff designates Count One as an FTCA claim against the United States. Liberally construed, Plaintiff has stated an FTCA claim in Count One. The Court will require the United States to answer Count One.

Plaintiff designates Count Two as an Eighth Amendment excessive force claim and Count Three as an Eighth Amendment medical care claim. Liberally construed, Plaintiff has stated claims for injunctive relief in Counts Two and Three. The Court will require Defendants Peters and Christensen in their official capacities only to answer Counts Two and Three. The Court will also require Defendants Peters and Christensen to respond to Plaintiff's Emergency Motion for Preliminary Injunction.[2]

**IV.   Motion to Appoint Counsel**

In her Motion to Appoint Counsel, Plaintiff asks the Court to appoint counsel to represent her in this case because she has a strong case; she is being subjected to "perpetual SHU placements in the BOP"; she does not have access to a law library or photocopier and has only limited access to a telephone in her current placement in the SHU at USP-Allenwood; the issues in this case are complex and will require further investigation and discovery, including depositions of numerous witnesses, and her ability to conduct

---

[2] In the Emergency Motion, Plaintiff asks the Court to order Defendants to immediately transport her to a hospital for MRIs, medical assessments, and any other medical evaluations or procedures necessary to assess the injuries she suffered during the October 31 and November 3, 2023 incidents and to determine whether any treatment or follow-up care is necessary.

discovery is heavily constrained by her pro se status, incarceration, and SHU status; and she suffers from multiple mental health impairments and is prescribed psychotropic and other medications that significantly impair her ability to concentrate and function.

There is no constitutional right to counsel in a civil case. *See Turner v. Rogers*, 564 U.S. 431, 441 (2011) (The Sixth Amendment "does not govern civil cases."); *Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009). Although 28 U.S.C. § 1915(e)(1) grants the Court limited discretion to "request" an attorney to represent an indigent civil litigant, *Agyeman v. Corr. Corp. of Am.*, 390 F.3d 1101, 1103 (9th Cir. 2004), this discretion may be exercised only under "exceptional circumstances," *id.*; *see also Terrell v. Brewer*, 935 F.2d 1015, 1017 (9th Cir. 1991).

A finding of exceptional circumstances requires the Court to "consider whether there is a 'likelihood of success on the merits' and whether 'the prisoner is unable to articulate [her] claims in light of the complexity of the legal issues involved.'" *Harrington v. Scribner*, 785 F.3d 1299, 1309 (9th Cir. 2015) (quoting *Cano v. Taylor*, 739 F.3d 1214, 1218 (9th Cir. 2014)). These considerations "must be viewed together," and neither is dispositive. *Palmer*, 560 F.3d at 970.

Having considered both elements, it does not appear exceptional circumstances are present at this time requiring the appointment of counsel in this case. Plaintiff is in no different position than many pro se prisoner litigants. The Court will deny Plaintiff's Motion to Appoint Counsel without prejudice.

**V.     Warnings**

    **A.     Release**

If Plaintiff is released while this case remains pending, and the filing fee has not been paid in full, Plaintiff must, within 30 days of her release, either (1) notify the Court she intends to pay the unpaid balance of her filing fee within 120 days of her release or (2) file a <u>non</u>-prisoner application to proceed in forma pauperis. Failure to comply may result in dismissal of this action.

## B. Address Changes

Plaintiff must file and serve a notice of a change of address in accordance with Rule 83.3(d) of the Local Rules of Civil Procedure. Plaintiff must not include a motion for other relief with a notice of change of address. Failure to comply may result in dismissal of this action.

## C. Copies

Plaintiff must serve Defendants, or counsel if an appearance has been entered, a copy of every document she files. Fed. R. Civ. P. 5(a). Each filing must include a certificate stating a copy of the filing was served. Fed. R. Civ. P. 5(d). Also, Plaintiff must submit an additional copy of every filing for use by the Court. *See* LRCiv 5.4. Failure to comply may result in the filing being stricken without further notice to Plaintiff.

## D. Possible Dismissal

If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1260–61 (9th Cir. 1992) (a district court may dismiss an action for failure to comply with any order of the Court).

**IT IS ORDERED:**

(1) Plaintiff's Motion to Appoint Counsel (Doc. 19) is **denied without prejudice**.

(2) The Clerk of Court must prepare a service packet and send by certified mail a copy of the Summons, the Second Amended Complaint (Doc. 16), the Emergency Motion for Preliminary Injunction (Doc. 17), and this Order to (1) the civil process clerk at the office of the United States Attorney for the District of Arizona and (2) the Attorney General of the United States, pursuant to Rule 4(i)(1) of the Federal Rules of Civil Procedure; and Defendants Peters and Christensen.

(3) Defendant United States must answer Count One of the Second Amended Complaint. Defendants Peters and Christensen, in their official capacities only, must

TERMPSREF

|   |   |
|---|---|
| 1 | answer Counts Two and Three of the Second Amended Complaint and respond to the |
| 2 | Emergency Motion for Preliminary Injunction. |
| 3 | (4) Defendants must answer the Second Amended Complaint or otherwise |
| 4 | respond by appropriate motion within the time provided by the applicable provisions of |
| 5 | Rule 12(a) of the Federal Rules of Civil Procedure. |
| 6 | (5) Any answer or response must state the specific Defendant by name on whose |
| 7 | behalf it is filed. The Court may strike any answer, response, or other motion or paper that |
| 8 | does not identify the specific Defendant by name on whose behalf it is filed. |
| 9 | Dated this 19th day of November, 2024. |

*[Signature]*
Honorable Scott H. Rash
United States District Judge